UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | **2:22-CR-20233-TBG-KGA-3** |
| Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER DENYING MOTION TO SUPPRESS (ECF NO. 67)** |
| **ANJAHNE WRIGHT,** | |
| Defendant. | |

Anjahne Wright faces federal charges arising from several armed robberies that occurred in the Ypsilanti, Michigan area in the fall of 2021. A grand jury has returned a first superseding indictment charging her with one count of aiding and abetting interference with commerce by robbery and one count of conspiring to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951(a). ECF No. 104.

Wright filed a motion to suppress evidence seized during searches of her apartment unit and a common-area laundry room in her apartment building, which occurred shortly after one of the robberies. ECF No. 67. She argues that the warrant authorizing the search of her unit was not supported by probable cause and that, subsequently, officers exceeded the scope of the warrant by also searching the laundry room.

The government filed a brief in opposition, and the Court held an evidentiary hearing in this matter on October 26, 2023. Having

1

considered the positions advanced in the briefs, the evidence and arguments presented at the hearing, and the relevant case law, the Court will—for the reasons explained below—**DENY** the motion.

## I.     BACKGROUND

### A. Facts

On September 24, 2021, the Washtenaw County Sheriff's Office received a call about an armed robbery at a Boost Mobile store in Ypsilanti, Michigan. ECF No. 1, PageID.3. The only employee who was working at the store was badly beaten, strangled, and robbed. *Id.*

The employee told responding officers that, just before the robbery, "a heavier set black female" entered the store and asked several questions but bought nothing. *Id.*; ECF No. 67-2, PageID.199. Shortly after she left, a man came in and asked similar questions, prompting the employee to ask if he was with the woman. ECF No. 1, PageID.3. Two more men then entered the store. *Id.* One, who wore a COVID-19 face mask, implied he had a gun, ordered the employee to get down on the ground, and made him to crawl to the back of the store. *Id.* at PageID.3-4. In the back, the three men—who were black—beat the employee, wrapped a rope around his neck, pulled it tight, and told him, "You are gonna die today." *Id.* at PageID.4. Abruptly, the robbers fled, taking with them several inventory items and the clerk's backpack. *Id.*

After officers finished interviewing the employee, a police dog led them directly from the store to the entrance of a "multi-unit" apartment

2

building, where Anjahne Wright leased a unit on the second floor. The building is part of the Aspen Chase apartment complex. *Id.* at PageID.4-5. Maintenance workers at the building reported seeing two black men run into it immediately after the robbery. ECF No. 67-2, PageID.199. In the eight days prior to the Boost Mobile robbery, the Aspen Chase complex had been linked to other armed robberies in the area.

## B. Warrant Application

After police secured a perimeter around the building, Washtenaw County Sheriff's Deputy Richard Traskos obtained a search warrant for Apartment 220B, Wright's unit, from the Washtenaw County District Court. His three-page affidavit supporting the application contained one paragraph describing the target location, a second paragraph describing the things to be seized, and a third paragraph with 13 sub-points setting out facts from the investigation. It described six armed robberies, culminating in the Boost Mobile robbery on September 24, 2021, and other suspicious activity occurring in the vicinity of Aspen Chase:

- <u>Robbery #1</u>: On September 16, officers responded to a report of an armed robbery at an "At Home" store, located immediately south of the Aspen Chase complex. ECF No. 67-2, PageID.198. A witness stated that a black male—twenty to thirty years old, with freckles, wearing all black clothes, gloves, and a mask—robbed the store with a sawed-off shotgun and fled east and north of the store. *Id.*

- <u>Robbery #2</u>: On September 18, officers responded to a report of an armed robbery of a food delivery driver during deliveries to two adjoining buildings at Aspen Chase. *Id.* at PageID.198-99. An "unknown black male" hit a delivery driver on the head with a pipe

3

and robbed him of $200 as he headed from the first delivery location to the second, which was Wright's unit. *Id.* The only physical description of the suspect provided was of an "unknown black male." A store clerk advised that, while two different numbers were used to place the food orders, the clerk believed the orders were made by the same person. *Id.* at PageID.199.

- Robbery #3: On September 20, officers responded to a report of an armed robbery of another delivery driver at Aspen Chase. *Id.* While attempting to deliver pizza in a building next to Wright's, a driver was robbed by "an unknown black male" with a sawed-off shotgun. (Here again, the only description of the suspect was of "an unknown black male.") A physical altercation ensued and the victim was strangled to the point where he began losing consciousness. *Id.*

- Robbery #4: On September 21, officers responded to a report of an armed robbery at a Speedway gas station in Ypsilanti. *Id.* Two robbers entered the store armed with a sawed-off shotgun. *Id.* The clerk reported that the shotgun had some yellow on the grip near the action. *Id.* The affidavit stated that "[one] of the suspects had the same physical description as the suspects of the previous robbery" but did not specify what that physical description was or which robbery had involved similar-looking suspects. *Id.*

- Robbery #5: On September 22, officers responded to a report of an armed robbery at a location in Pittsfield Township. *Id.* Two robbers with "similar physical descriptions" to the suspects who robbed the Speedway gas station on September 21 entered a store and robbed the clerk with a sawed-off shotgun that also had yellow near on the grip near the action. *Id.* A shotgun with yellow on the grip was later found in a vehicle abandoned at a nearby Meijer parking lot. *Id.*

- Disorderly Persons Incident: Also on September 22, a little over an hour after the report of the Pittsfield Township robbery, officers responded to a call about disorderly persons at Wright's building. *Id.* The caller advised that someone was yelling "go get my gun." *Id.* When a deputy arrived on scene, he saw a black male in dark clothing standing in the vestibule of Wright's building. *Id.* On seeing the deputy, the male fled into Wright's unit. *Id.* The deputy

4

contacted Wright, but she was uncooperative, so the deputy was unable to speak with the black male he had seen. *Id.*

- Robbery #6: On September 24, officers responded to the report of the Boost Mobile robbery. *Id.* The clerk advised that three black males wearing all black clothing and yellow gloves entered the store and implied they had a firearm. *Id.* They beat the clerk, stole multiple items (including the clerk's dark brown backpack), and fled. *Id.* The clerk stated that a "heavier set black female suspect" entered the store as a scout before the incident. *Id.* Officers did not conduct a photo line-up, as the clerk was experiencing impaired vision from his injuries. *Id.* A police dog led officers from the store directly to the entrance of Wright's building, and maintenance workers reported seeing two black males wearing all black run into that building. The affidavit stated that Officers "have maintained a perimeter at [the building] since arrival at that location." *Id.*

In addition to the facts about the robberies, Deputy Traskos attested that, at the time of his application, Wright had two outstanding warrants for failure to appear: one for an unknown crime and another for retail fraud. *Id.* at PageID.200. A criminal history check revealed that she had some arrests for retail fraud and a breaking-and-entering incident, though the affidavit did not detail when these arrests occurred or whether they had resulted in convictions. *Id.*

Deputy Traskos also swore that information from CLEMIS ("Court and Law Enforcement Management Information System," a law enforcement database) showed that Wright "has multiple associates … that have similar physical appearances to the suspects." *Id.* But he did not describe the actual appearances of Wright's associates or how they were similar to the robbery suspects. *Id.* Deputy Traskos further stated

that Wright was the lease holder of Apartment 220B and that she "has a similar physical description to the subject [that the Boost Mobile clerk] described entering the store as the scout before the robbery." Again, he did not provide specifics regarding how Wright's physical description was similar to the person who the Boost Mobile clerk described as the scout. *Id.* The affidavit concluded that Deputy Traskos believed that a search of Wright's unit would "result in the collection of evidence of the above crimes and apprehension/identification of the above suspects." *Id.*

The warrant authorized a search of Wright's apartment, which it described as a unit on "the second floor of the structure and at the North West corner of the center of the building." *Id.* at PageID.201.

## C. Laundry Room Search

After executing the warrant for Wright's unit, officers also searched a lower-level common laundry room. ECF No. 1, PageID.6. Washtenaw County Sheriff's Deputy Austin Pearson, who assisted in the execution of the warrant and conducted the search, testified that he undertook the search because he did not find evidence from the robbery in Wright's unit and, especially because of the police perimeter being maintained around the building, he was concerned that the robbers were still hiding inside.

According to Pearson, after searching Wright's unit, he decided to check the building's downstairs area and parking lot. A SWAT team had cleared Wright's unit before officers searched it, he said, but the team did not clear the rest of the building. After finding nothing in the dumpsters,

Pearson re-entered the building and asked if anyone had checked the laundry room. He testified that he knew the room was unlocked, so he wanted to search for both suspects and stolen property. He acknowledged that he had only a general description of the suspects as three black males: "one was heavier set and the two were just average build, average height." Without more, he said, this would not be enough for an arrest.

Deputy Pearson testified that, when he entered the room, it was dark, and he needed his flashlight. But he immediately saw something unusual: a 50-gallon plastic trash can was pushed against the wall, and an empty, clear, plastic trash bag was stretched tightly over its top like clingwrap. When he shined his light over the bag, he saw something underneath that looked like a dark backpack. After removing the bag, he found: (1) a training handgun; (2) eight COVID-19 face masks; (3) two pairs of yellow gloves; (4) one black glove; (5) a red hoodie; (6) several electronic items from Boost Mobile; and (7) the store clerk's brown backpack. *Id.* at PageID.6-7.

Deputy Pearson explained that he regularly responds to 1-3 calls from Aspen Chase per shift. While each of its buildings requires a key for entry, the locks are often broken and tenants leave the doors propped open; for every 5 out of 10 times Pearson visited, the doors "just open[ed]." Pearson testified that he has found weapons and drugs in the laundry rooms on several occasions, as well as individuals hiding from inclement weather, doing drugs, and trying to steal from the machines. He

7

explained that, because of the volume of trespass problems at the complex, management has an arrangement with the Washtenaw County Sheriff's Office authorizing officers to enter common areas to search for trespassers at any time. While Deputy Pearson normally would need a warrant to search for evidence, he believed that he could generally "make sure there's no crime being committed down there by people."

Jeremy Grasshoff, the director of operations at Aspen Chase on the day in question, also testified. He explained that the complex contains approximately 22 buildings, some of which are connected. He confirmed the buildings require a key for entry. He further testified that, in March 2021, he executed a Power of Attorney document to give police "full go of wherever they need[ed] to get to in our community" without the need for employees to be present. He acknowledged that he did not typically tell tenants about the document and that, on its face, the document did not expressly authorize officers to conduct searches.

Grasshoff testified that, when he reported for work on the morning of the robbery, he saw several squad cars. Maintenance workers told him men had fled into one of the buildings. He believed that the Power of Attorney document was intended to grant officers authority to enter to the buildings to search for suspects in such situations. Grasshoff confirmed that the laundry room was open 24 hours a day and did not require a separate key. Between residents, maintenance workers, and

cleaning contractors, he estimated that over 60 people would have access to the laundry room—not counting guests.

## II.   LEGAL STANDARDS

Federal constitutional law applies to state warrants challenged in federal court. *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022). The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To establish probable cause, officers must establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Put another way, there must be a "nexus" between the "place" to be searched and the "things" to be seized. *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021).

In assessing the sufficiency of an affidavit supporting a warrant, the Court looks only to the four corners of the warrant; information known to an officer but not conveyed to the issuing judge is irrelevant. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010). To encourage use of the warrant procedure, a magistrate judge's probable-cause determination is afforded "great deference" and should be reversed only if the issuing judge arbitrarily exercised his discretion. *Gates*, 462 U.S. at 236 (quotation omitted); *see also United States v. Baker*, 976 F.3d 636,

646 (6th Cir. 2020) (recognizing courts' obligations to give issuing judges the benefit of the doubt in "doubtful or marginal cases").

## III.   ANALYSIS

Wright moves to suppress evidence seized during the searches of her unit and the laundry room. Her challenges are two-fold. First, she argues that the warrant application did not establish a satisfactory nexus between her unit and evidence of a crime. ECF No. 67. Second, she urges that—whether or not the warrant was properly issued—officers exceeded its scope when they also searched the laundry room. ECF No. 75.

### A. Sufficiency of the Warrant

Wright first challenges whether the facts set out in the affidavit established probable cause that evidence would be found in her unit. ECF No. 67, PageID.187-91. She acknowledges that the affidavit establishes that several robberies occurred near her *complex*—and, further, that it provides some basis for inferring that the Boost Mobile robbers fled into her *building*. *Id.* at PageID.187. She argues, however, that the facts do not establish any likelihood that evidence would be found in her *unit*. According to Wright, the affidavit fails to articulate any link between criminal activity and her specific unit. *Id.* at PageID.188-90. She emphasizes that she was never positively identified as a suspect in the Boost Mobile robbery. *Id.* at PageID.190.

The government maintains that the affidavit establishes that six recent armed robberies in the area likely were related and connected to

Wright. According to the government, "[a]n interview of the [Boost Mobile] victim established that Wright was involved in the robbery." ECF No. 70, PageID.206, 215-22. The government contends that—because the robberies appear to be related, Wright matches the general description of the scout described by the last victim, and a police dog tracked the robbers to her building immediately after the last robbery—reasonable inferences may be drawn both that Wright and the robbers fled to her unit following that robbery and that evidence would be found there.

The reasonableness of the inference that evidence would be found in Wright's unit depends on the strength of the evidence that she was involved in the Boost Mobile robbery. As explained below, the government overstates the strength of the Boost Mobile clerk's description of the "scout." Far from "establishing" that Wright was involved in the robbery, the victim clerk could only provide a generic description of a heavier-set black female. After carefully reviewing the affidavit, the Court concludes that the facts were insufficient to establish probable cause that evidence or the suspects would be found inside Wright's unit. However, because of the level of detail supplied in the affidavit about the over-all investigation, the nature of the inferences that could be drawn from those details, and the circumstances under which the warrant was obtained, a reasonably well-trained police officer would not have known to second-guess the issuing judge's decision and could rely on the warrant in good faith.

11

### 1. Probable Cause

The probable cause analysis takes into account the totality of the circumstances and does not require the more exacting precision of the "beyond a reasonable doubt" or the "preponderance of the evidence" standards. *Gates*, 462 U.S. at 235. The Supreme Court has recognized that warrant applications are typically drafted "by persons who are neither lawyers nor judges, and who certainly do not remain abreast of each judicial refinement of the nature of 'probable cause.'" *Id.* Nonetheless, a supporting affidavit must contain enough specific information to enable the issuing judge to conclude that there is a fair probability that evidence of a crime will be found in a particular location. *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008).

This "nexus" requirement—that there must be a connection between the place to be searched and the evidence to be seized—is well established. Notwithstanding the crime at issue, to justify the issuance of a residential search warrant, "[t]he connection between the residence and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016). "[P]hysical entry of the home is the chief evil against which … the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quotations omitted). The right of a citizen "to retreat into his own home and there be free from unreasonable governmental intrusion"

is at the "very core" of the Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quotations omitted).

The bulk of Deputy Traskos's affidavit is devoted to summarizing facts from a series of armed robberies that occurred over a nine-day period, leading up to the Boost Mobile robbery. Most (but not all) of these robberies occurred at or in the immediate vicinity of the Aspen Chase complex. But only the final one—at Boost Mobile—mentions a female suspect. The government's position relies on the assumption that the Boost Mobile clerk identified Wright as the "scout" in that robbery. The Court's analysis thus begins with whether the affidavit establishes probable cause to believe that Wright was the "scout."

Generally, "it is untenable to conclude that property may not be searched unless its occupant is reasonably suspected of a crime and is subject to arrest." *Zurcher v. Stanford Daily*, 436 U.S. 547, 559 (1978). Conversely, the mere "fact that there is probable cause to arrest a person for a crime does not automatically give police probable cause to search his residence or other area in which he has been observed for evidence of that crime." *United States v. Savoca*, 739 F.2d 220, 225 (6th Cir. 1984).

Here, however, the two inquiries are linked. If there was probable cause to believe that Wright participated in the robbery as the "scout," then it is reasonable to infer that—especially because a police dog led officers straight to the front door of her building immediately after the robbery—Wright and her co-conspirators fled to her unit to stash ill-

13

gotten gains. *United States v. Cobb*, 397 F. App'x 128, 133 (6th Cir. 2010) (inference that evidence of robbery would be in suspect's home was reasonable). Probable cause that Wright was the "scout" could potentially also support an inference that she was connected to the other robberies.

In his affidavit, Deputy Traskos sets forth three facts in support of a direct connection between Wright and the Boost Mobile robbery:

- "[The clerk] indicated that a heavier set black female suspect entered the store as a scout before the incident." ECF No. 67-2, PageID.199.

- "Wright has a similar physical description to the subject [that the clerk] described entering the store as the scout before the robbery." *Id.* at PageID.200.

- "Wright has multiple associates per CLEMIS that have similar physical appearances to the suspects." *Id.*

The first and second facts are of a piece: (1) the clerk says that the "scout" was a "heavier set black female," and (2) Wright's description is "similar." The Sixth Circuit has held that "an eye witness identification and accusation, by itself, is sufficient to establish probable cause." *Legenzoff v. Steckel*, 564 F. App'x 136, 142 (6th Cir. 2014). But here, as Deputy Traskos attested, there was never a positive identification because—on account of the injuries he sustained—the only eyewitness was unable to view a photo array. The affidavit contains only a generic description of the "scout" as a "heavier set black female," plus a conclusory assertion that Wright's appearance was "similar." The description is general, vague, and lacking in detail. It supplies some basis

for inferring that Wright could be the woman that the clerk saw, but it falls short of being a positive eye-witness identification.

The third fact—that, according to a police database, Wright has associates who have "similar physical appearances" to the suspects—is similarly general, vague, and conclusory. It states the affiant's conclusion that Wright's associates resembled the suspects but does not supply any facts enabling a judicial officer to independently reach this conclusion. How many associates does Wright have that resemble the suspects? How are those associates similar in appearance to the suspects?

In the context of a *Terry* stop, a suspect's description must adequately "winnow" the class of potential suspects to supply reasonable suspicion. *See, e.g.*, *United States v. Davis*, 341 F. App'x 139, 140-41 (6th Cir. 2009). A generic description that could apply to any number of people in the area is impermissible because it cannot provide a "particularized and objective basis for suspecting [a] particular person." *King v. United States*, 917 F.3d 409, 426 (6th Cir. 2019) (quotations omitted), *cert. granted on other grounds*, *Brownback v. King*, 140 S. Ct. 2563 (2020). The descriptions of the suspects here are too vague to adequately "winnow" the class of suspects. And probable cause, while not a particularly exacting standard, is a higher bar than reasonable suspicion.

Deputy Traskos also included information about Wright's criminal history. He stated that "Wright has two (2) confirmed and valid warrants," one for an unknown crime and one for retail fraud third, and

15

further that she had "been arrested and suspect in numerous retail frauds and a breaking and entering." ECF No. 67-2, PageID.200. But while criminal history is relevant to the probable cause analysis, *United States v. Wagers*, 452 F.3d 534, 541 (6th Cir. 2006), the affidavit did not detail Wright's prior arrests in a manner that would permit a judicial officer to know whether any of the arrests were recent or led to convictions. *United States v. Ward*, 967 F.3d 550, 555 (6th Cir. 2020) ("Undated charges, without further information, are not probative of whether Ward used his residence to traffic drugs at the time officers effected the search.").

Probable cause to suspect a person of a crime exists when the "facts and circumstances within [an] officer's knowledge [] are sufficient to warrant a prudent person … in believing … that the suspect committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). While the facts discussed above set forth reasons why a reasonable and diligent officer would want to further investigate Wright's potential involvement in the Boost Mobile robbery, they fall short of establishing probable cause.

The Court next considers whether the affidavit contains any other facts connecting Wright's unit to a crime. As noted above, Wright concedes that the affidavit establishes that a string of robberies occurred in the vicinity of her unit. The affidavit also mentions Wright's unit twice:

- On September 18, a delivery driver en route to Wright's unit was beaten with a pipe and robbed after completing a delivery at an adjoining building. The store clerk advised that it appeared that the same person placed both orders being delivered that night. ECF No. 67-2, PageID.198-99.

- On September 22, within an hour of a robbery occurring in Pittsfield Township, police responded to a disorderly persons call at Wright's building regarding a person who was yelling "go get my gun." An officer observed a black male in dark colored clothing in the lobby and tried to speak with him, but the male "fled" into Wright's unit. Wright refused to let the officer speak with the male. *Id.* at PageID.199.

But, even recognizing the deference owed to the issuing judge, the Court concludes that these additional attestations are insufficient to establish a nexus between Wright's unit and any criminal activity.

*First*, as to the robbery of the delivery driver on September 18, the only connection to Wright is that the driver was on his way to make a delivery to her unit when he was assaulted. Deputy Traskos attested that a restaurant employee believed that the same caller placed both orders being delivered that evening. While this fact raises questions a diligent officer would want to investigate, by itself it does not establish probable cause that Wright was involved in that robbery. It is unknown whether Wright herself placed the order—and, even if she did, that fact alone would not suggest that she did so to arrange a robbery. The affidavit also references a second armed robbery of a delivery driver on September 20 at a different building in Wright's complex. But that robbery involved a different weapon and was not connected to her unit or even her building.

17

*Second*, the disorderly persons call on September 22 is connected to the other robberies only through temporal proximity. The affidavit notes that the caller reported that someone yelled "go get my gun." But there are no facts that would allow a judicial officer to conclude that the man the responding officer saw in the lobby was a suspect in the Pittsfield robbery or the disorderly persons call. As the encounter is described, the officer neither confirmed that the male was the subject of the call nor saw him engage in any unlawful activity. That the robbery preceded the call does not mean the two events were related. And Wright's refusal to allow the officer to contact the person who entered her unit is insufficient to create a link between Wright, her unit, and criminal activity. A citizen's cooperation with law enforcement is commendable, but it is not compulsory. Absent a warrant, Wright had no legal obligation to permit the officer to enter her apartment to question someone. "The exercise of a constitutional right, whether to refuse to consent to a search, to refuse to waive *Miranda* rights or to decline to testify at trial, is not evidence of guilt." *United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011).

During oral argument, the government suggested that the male's disappearance into Wright's unit nonetheless established some sort of link between Wright and criminal activity because it occurred after a report of somebody yelling "go get my gun" a little over an hour after the shotgun-point robbery in Pittsfield Township. But, aside from the fact that the two incidents occurred on the same evening, there is no evidence

suggesting they are connected. No information ties the male at Wright's building to the Pittsfield Township robbery. A Google Maps search shows that the address of the robbery was some 4.6 miles away. Such proximity does not suggest one way or the other whether incidents were related— especially since the affidavit contains facts that the Pittsfield Township robbers abandoned their vehicle shortly after the robbery.

"Probable cause is not a high bar, but neither is it a nonexistent one." *United States v. Waide*, 60 F.4th 327, 335 (6th Cir. 2023) (quotations and citations omitted). Here, the affidavit needed to provide facts showing that there was a fair probability that evidence of a crime would be found in specifically in *Wright*'s unit.

Taken as a whole, the affidavit sets forth facts explaining why a diligent officer would immediately want to further investigate Wright: a robbery spree took place in the general vicinity of her complex; the victim of one of those robberies was a delivery driver headed to her unit; the robberies appeared to be related because many featured similar suspects and weapons; a police dog tracked the robbers from the final robbery at Boost Mobile directly to the entrance of her building, and maintenance workers also saw suspects running into the building; Wright's physical description was "similar" to the description of the "scout" who participated in that robbery; and Wright had associates in a police database that resembled the other suspects.

But, because of the lack of details and other infirmities described above, the facts in the affidavit fall short of the "substantial basis" necessary to establish a probable cause that evidence of a crime would be found in her unit.

### 2. *Good Faith Exception*

Of course, the analysis does not end there. The government asserts that the good-faith exception, articulated in *United States v. Leon*, 468 U.S. 897, 922 (1984), applies to the search. ECF No. 70, PageID.226.

The exclusionary rule typically precludes the government from using evidence obtained in violation of the Fourth Amendment against a victim of the unlawful search or seizure. *See, e.g.*, *Illinois v. Krull*, 480 U.S. 340, 347 (1987). Once a warrant is issued, however, there is generally "nothing more [a] policeman can do in seeking to comply with the law." *Leon*, 468 U.S. at 921 (quotations omitted). So, under the "good faith" exception, the government may use evidence "obtained [by police acting] in objectively reasonable reliance on a subsequently invalidated search warrant." *Id.* at 922. The rationale behind the exception is that the exclusionary rule exists to deter the misconduct of officers, not judges—so nothing is gained by punishing officers for relying on a judge's decision. *United States v. Davis*, 84 F.4th 672, 678-79 (6th Cir. 2023).

In determining whether the exception applies to a search authorized by a warrant, courts ask the question: Would a reasonably well-trained officer know that the search was illegal despite a judge's

decision to issue a warrant? *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). If the answer is "yes," suppression is appropriate; the standard is an objective one. *Id.*

The Supreme Court has instructed that reliance on a warrant is objectively unreasonable in the following four circumstances:

(1) the officer knowingly or recklessly provided false information;

(2) the magistrate was not neutral and detached;

(3) the supporting affidavit was "bare bones"—*i.e.*, "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or

(4) the warrant is so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that executing officers could not reasonably think it valid.

*Leon*, 468 U.S. at 923 (quotations and citations omitted).

Wright argues that the third scenario applies here—*i.e.*, that the affidavit was "bare bones." The Sixth Circuit has offered various definitions of a "bare bones" affidavit: one that "states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge," *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) (quotations omitted); one that "asserts only the affiant's belief that probable cause existed," *White*, 874 F.3d at 496 (quotations omitted); and one that is "completely devoid of facts to support the affiant's judgment that probable cause exists, or so

21

vague as to be conclusory or meaningless." *United States v. Houghton*, 861 F. App'x 83, 87 (6th Cir. 2021) (quotations omitted).

In contrast, an officer's reliance on a warrant is reasonable—and it is not "bare bones"—if the warrant application contains a "minimally sufficient nexus between the illegal activity and the place to be searched." *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc). Such a nexus exists when a court can "identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been— some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched." *White*, 874 F.3d at 497 (quotations omitted, emphasis in original). There must be daylight between an affidavit which simply fails to establish probable cause and one that is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" for the good-faith exception to achieve its objective of striking a balance between safeguarding Fourth Amendment rights and facilitating the truth-seeking function of a criminal trial. *Id*. at 497-98.

The Sixth Circuit has cautioned that "not every iota of evidence qualifies as a modicum." *United States v. Tucker*, 742 F. App'x 994, 999 (6th Cir. 2018). In particular, "a single piece of evidence which the law of the station house shop would recognize as clearly insufficient" does not invoke the good faith exception. *Id.* (quotations omitted). But the "good-faith inquiry is confined to the objectively ascertainable question whether

a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Savoca*, 761 F.2d 292, 295 (6th Cir. 1985) (quotations omitted). "An officer's decision to obtain a warrant is prima facie evidence that he or she was acting in good faith." *United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002). When evidence has been seized pursuant to a subsequently invalidated warrant, the Court applies an analysis similar to that used in evaluating the affirmative defense of qualified immunity and suppresses evidence only when it is clear, after review, that the warrant application was so plainly deficient "any reasonably well-trained officer would have known that … he should not have applied for the warrant." *Id.* at 869 (quotations omitted).

Much of the Sixth Circuit's good-faith case law has arisen in drug trafficking cases and concerns when officers can reasonably believe there is probable cause to search a confirmed or suspected drug dealer's residence. *See, e.g.*, *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018) (collecting cases). The analysis focuses on whether an affidavit details that police had reliable proof that the targeted suspect was recently (or ever) engaged in drug dealing. *United States v. Reed*, 993 F.3d 441, 451 (6th Cir. 2021). If yes, reliance on a warrant is frequently deemed reasonable, and suppression of evidence is inappropriate.

These principles extend also outside of the drug-trafficking context. The Court's review of the case law shows that the good-faith battleground

23

often concerns whether an officer has adequately corroborated an informant's tip to establish a nexus between suspected criminal activity and the target of a search warrant based on current information.

In *Houghton*, for instance, the Sixth Circuit applied the good-faith exception to uphold a residential search warrant for stolen tools based on an informant's statements that he had seen the tools in the defendant's possession and knew where they had been stolen from. 861 F. App'x. at 86-87. The application did not say the informant saw the tools at the defendant's residence but the provided names of potential accomplices and information that police saw the defendant at the home of one of the accomplices—plus attestations from the investigator that thieves often store their wares in their own or a co-conspirator's residence. *Id.* at 89. Given these details, the court concluded that the affidavit described more than a "mere guess" that evidence would be found in the defendant's home and that reasonably well-trained officers therefore would not know to second-guess a judge's decision to issue a warrant. *Id.* at 89-90.

Similarly, in *Van Shutters*, the Sixth Circuit applied the good-faith exception to uphold a residential search warrant concerning an auto-theft scheme in which the defendant used fraudulent checks to "purchase" vehicles and resold them before the phony checks were discovered. 163 F.3d at 333. The supporting affidavit described the residence to be searched, the items to be seized, and the defendant's involvement in the scheme and stated that the residence was "available"

24

to the defendant. Although it did not explain why investigators believed the defendant had any connection with the residence, a reviewing panel concluded that "only a police officer with extraordinary legal training would have detected any deficiencies" given the personal knowledge and level of detail in the affidavit. *Id.* at 337.

And in *Savoca*, the Sixth Circuit applied the good-faith exception to an affidavit that "only tenuously connected the place to be searched with the two persons for whom arrest warrants were outstanding." 761 F. 2d at 297. The defendants were bank robbers who had been arrested in Arizona on arrest warrants for a bank robbery that occurred in Ohio on an unspecified date and were wanted for several other bank robberies. The warrant authorized a search of an Arizona motel room where they had been seen. While the reviewing panel concluded that the affidavit supporting the warrant did not draw a sufficient nexus to the motel room, it held that the defect was "a simple miscalculation in the probable cause equation." *Id.* at 296. "[A] reasonably well-trained officer could have reached the opposite conclusion" regarding probable cause because its existence depended on an application of recent case law open to interpretation. *Id.* at 297. More specifically, "a reasonably well-trained officer could have concluded that one could infer from the type of evidence sought (especially the money) that it would be retained within the close control of [the defendants] for a reasonably long period of time" given the suspects' involvement in a series of such robberies. *Id.* at 298 n.9.

By contrast, the Sixth Circuit has declined to apply the good-faith exception where the information in an application was stale, entirely uncorroborated, or failed to provide even a "remote" link between criminal activity and the target location. *See, e.g.*, *United States v. Lewis*, 81 F.4th 640, 648 (6th Cir. 2023) (refusing to apply good-faith exception where magistrate could conclude there was probable cause only by substituting detective's evaluation of evidence for magistrate's own); *Waide*, 60 F.4th at 342 (no good faith where affidavit articulated only a "hunch" that a crime had occurred and information that defendant refused to turn over requested camera footage voluntarily); *Tucker*, 742 F. App'x at 1000 (no good faith where facts in affidavit were limited to mere presence of suspected drug dealer at target location and unverified four-month old tip that drug dealing may have occurred there); *United States v. Laughton*, 409 F.3d 744, 750 (6th Cir. 2005) (no good faith where affidavit failed to provide any link between drug trafficking and target location, distinguishing it from cases where affidavits established "some connection, regardless of how remote it may have been, between the criminal activity at issue and the place to be searched") .

Here, the affidavit does not lack for veracity, reliability, or basis of knowledge—most of the facts derive from investigations of specific robberies by named police officers and interviews with victim witnesses. This is not a situation involving anonymous sources of unknown reliability or veracity. Some of the statements are conclusory; others are

based on verifiable facts. It cannot be said that the affidavit contains "only" the affiant's "belief" that probable cause existed, or that it is "nothing more than a guess … completely devoid of facts … or so vague as to be conclusory or meaningless."

Reading the warrant in "a practical, common sense manner," *Van Shutters*, 163 F.3d at 337, and keeping in mind that "legal principles do not operate in a vacuum but instead only with reference to particular facts," *Savoca*, 761 F.2d. at 297, the Court concludes that the affidavit provides "some connection" between the criminal activity it describes and Wright's unit, such that reasonable officers would not know to second-guess the issuing judge's decision to authorize the warrant.

*First*, Deputy Traskos made the decision to seek the warrant in a situation of near exigency. Officers had set up and were maintaining a perimeter around Wright's apartment building after a police dog tracked suspects from a crime scene directly to the entrance of the building. Traskos further had information that maintenance workers had seen men dressed in black clothes running into the building immediately after the robbery. Consequently, there was very strong evidence that the suspected robbers were in the building—and likely in possession of fruits of the crime—at the moment the search warrant was being sought and executed. The question was: where in the building were they?

*Second*, the affidavit sets out facts providing an answer to the question why Traskos believed evidence of criminal activity would be found in Wright's unit (as opposed to somewhere else), specifically:

- Wright's unit was in the building to which the police dog led responding officers;

- The victim described a "heavier set black woman" as the "scout" who appeared to be part of the robbery team, and Wright "matched" that general description;

- There had been six robberies that seemed related to one another, and four of them had connections to either her complex, building, or unit;

- Wright had associates who allegedly had physical descriptions similar to those of individuals involved in the robberies; and

- Wright had a criminal history that involved retail fraud and breaking and entering arrests.

As discussed above, the attestations above have weaknesses. Some are detailed; others are more conclusory. As a whole they do not rise to the level of probable cause. But law enforcement officers are not attorneys and, to use *Leon*'s language, must often make "hurried judgments." This is especially so in this case, where officers were on the ground, maintaining an active perimeter around a building in which the suspects were believed to be hiding, made the decision to seek a warrant in the middle of an emergent investigation.

In reviewing the warrant as a whole, the Court is unable to conclude that reasonable officers in the midst of an active investigation confronted with the situation in this case would realize—given the

technical defects noted above—that the warrant application was "so lacking" that they should have second-guessed the issuing judge's decision to authorize the warrant. Traskos's decision to seek a warrant under the circumstances is prima facie evidence of good faith, and his affidavit supplies some connection—albeit an imperfect one—between criminal activity and Wright's unit. Accordingly, the good faith exception applies, and Wright's motion must be denied as to the search of her unit.

### B. Laundry Room Search

Wright also challenges the constitutionality of the search of her building's common-area laundry room. ECF No. 67, PageID.191; ECF No. 75. She argues that, because her building was locked, officers either needed a separate warrant or another justification for the search.

In *United States v. Carriger*, 541 F.2d 545, 550-51 (6th Cir. 1976), the Sixth Circuit held that "a tenant in [a locked] apartment building has a reasonable expectation of privacy in the common areas of the building not open to the general public." In that case, officers tried to enter the defendant's apartment building and discovered that it was locked. *Id.* at 548. Undeterred, they waited for workmen to exit and, without permission, slipped in before the door closed. *Id.*

The Sixth Circuit rejected the notion that entry into a locked building is constitutional simply because it is peaceable. *Id.* at 549. It has since reaffirmed this basic holding repeatedly. *See, e.g.*, *United States v. Kimber*, 395 F. App'x 237, 244-45 (6th Cir. 2010) (not permissible to force

lock or take advantage of fallible lock absent warrant); *United States v. Heath*, 259 F.3d 522, 534 (6th Cir. 2001) (not permissible to use keys lawfully seized from arrestee to enter locked building without warrant).

The government concedes that Wright had *some* expectation of privacy in the laundry room. ECF No. 70, PageID.224; ECF No. 77, PageID.250-51. It further acknowledges that the laundry-room search exceeded the scope of the warrant. ECF No. 77, PageID.258. But it argues that the police had permission to access the building's common areas— and that, in any event, Wright cannot assert a reasonable expectation of privacy in a common-area trashcan. *Id.* at PageID.251, 260.

### 1. Consent

Consent is a well-established exception to the Fourth Amendment's warrant requirement. *Andrews v. Hickman Cty.*, 700 F.3d 845, 854 (6th Cir. 2012). "Valid consent may be given not only by the defendant but also by a third party who possessed common authority over … the premises or effects sought to be inspected." *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (quotations omitted).

In support of its position that officers had valid consent to search the laundry room, the government submitted a copy of a Power of Attorney document submitted by a representative of the company that owns the Aspen Chase apartments. The document reads:

> The Washtenaw County Sheriff's Office and its Deputies are empowered to enforce trespass and issue trespass notices to persons found to be illegally upon the property.

ECF No. 79, PageID.273. The government offered testimony establishing that the document's purpose was to allow officers "full go of wherever they need to get in [the] community," that the laundry room did not require a separate key, and that officers were concerned about the possibility that the robbers were still in the building. Accordingly, it argues, the document established valid consent for a warrantless search.

The facts of this case are similar to those in *United States v. Kimber*—with one important distinguishing characteristic. In *Kimber*, the officers were members of a crime squad. 395 F. App'x at 238. In inclement weather, they decided to enter an apartment building known to be a crime "hot spot" instead of patrolling the streets. *Id.* at 239. After forcing the back door, they saw the defendant in a common area with a handgun and arrested him. *Id.* In defending the entry into the building, the government argued that officers had a letter granting consent, similar to the document here, authorizing entry into building common areas to enforce criminal trespass laws. *Id.*

Critically, in the *Kimber* case, the building's management had changed several times, and the government's trespass letter post-dated the officers' entry. *Id.* at 244-45. The Sixth Circuit rejected the argument that—on those facts—officers had valid consent to enter. *Id.* The "after-the-fact" letter could not retroactively authorize the entry, and the prior

31

owner's consent also did not suffice because that owner no longer had authority over the property. *Id.* Since there was no valid letter on file and nothing suggesting officers had spoken to a current building representative regarding their authority to enter, the entry into the building was impermissible.

But here, Pearson had a *current* trespass letter—executed by the director of operations only a few months before the incident. Under *Kimber*, this appears to be sufficient to grant consent to search.

Wright retorts that the search exceeded the scope of the consent granted by the document. She argues that Pearson did not enter the laundry room for a permissible purpose—*i.e.*, he intended to *search*, not remove anyone, after finding nothing rummaging around her unit and an outside dumpster. ECF No. 82, PageID.279-80.

But Pearson's testimony from the hearing refutes this argument. True enough, part of the reason he entered the laundry room was because he intended to search for stashed items. And he acknowledged that, ordinarily, he would need a warrant to conduct a search for evidence. But he also testified that he was concerned that suspects might be hiding in the room—and that he could go there to "make sure there's no crime being committed down there by people."

The scope of consent is measured under an "objective" standard. The critical question is: what would a reasonable person have understood the agreement to be? *See, e.g.*, *Florida v. Jimeno*, 500 U.S. 248, 251

(1991). True enough, the Power of Attorney document does not expressly authorize searches; Grasshoff acknowledged as much at the hearing. But he also stated that the document was intended to encompass this kind of scenario. The Court concludes that—because the robbers were understood to be in the building—an average person would have seen the trespass letter as including permission to search common areas for the suspects and evidence of where they may have gone.

### 2. *Expectation of Privacy in Common-Area Trashcan*

Assuming for the sake of argument that the trespass document did not establish consent to the search, the Court agrees with the government that—under the circumstances—Wright cannot assert a reasonable expectation of privacy in the laundry room's trashcan.

As discussed above, in *Carriger*, the Sixth Circuit recognized that tenants have *some* expectation of privacy in locked common areas of multi-unit buildings. In that case, the Sixth Circuit reasoned that *"Katz*, considered with the case law before it, should be read as holding that trespassing is one form of intrusion by the Government that may violate a person's reasonable expectation." 541 F.2d at 549. But, when police gain entry to locked common areas as the guests of another tenant or through an "obliging landlady," they are generally legally present, and a defendant cannot complain about evidence they find or activities they observe in those areas. *Id.* at 550 (citing *McDonald v. United States*, 335 U.S. 451 458-49 (1948) (Jackson, J., concurring)).

*Carriger* remains the law of the Sixth Circuit. *See United States v. Dillard*, 438 F.3d 675, 683 (6th Cir. 2006). But it is out-of-step with the law elsewhere in the nation. *See, e.g.*, *United States v. Miravalles*, 280 F.3d 1328, 1332 (11th Cir. 2002) ("The only circuit that has recognized a reasonable expectation of privacy in the common areas of an apartment building, at least when the door is locked, is the Sixth Circuit."). And the Sixth Circuit has been cautious about expanding its scope. *United States v. Trice*, 966 F.3d 506, 515 (6th Cir. 2020) (declining to expand *Carriger* to unlocked hallway of building); *Dillard*, 438 F.3d at 684 (declining to expand *Carriger* to unlocked hallway and stairway of duplex notwithstanding that "[t]here may have been fewer people regularly entering … than in a multi-unit apartment building").

Wright disputes that the Power of Attorney document authorized a *search*. But there is no dispute that it authorized *entry* into the laundry room. There is also testimony from Grasshoff and Pearson that the room was unlocked and that upwards of 60 tenants, maintenance personnel, and cleaning contractors had access to it and the trashcan in it—not including guests. These facts weigh against a finding that Wright had a possessory interest in the trashcan's contents, a right to exclude others from it, or could take any reasonable precautions to maintain privacy in its contents. *See Dillard*, 438 F.3d at 682.

In view of *Carriger*, the Court's analysis would be different if officers gained entry to the room surreptitiously. But the concerns in that

case that officers forced their way into a locked area "without authority or invitation" are not present here. 541 F.2d at 552. The kind of search that occurred here was considered permissible under *Carriger*. Consequently, because Wright had no reasonable expectation of privacy in the contents of a trash can in the common-area laundry room, and Pearson was legally present in that room with permission of the landlord, the search did not constitute a Fourth Amendment violation.

Wright's motion is therefore denied as to the laundry-room search.

## IV.   CONCLUSION

For the reasons explained above, Wright's motion is **DENIED**. The government may use at trial any evidence discovered in the search of Wright's unit and the common-area laundry room of the building. [1]

**IT IS SO ORDERED**, this 22nd day of January, 2024.

---

[1] The Court is cognizant that more than 30 days have elapsed between when this matter was argued, on October 26, 2023, and today's decision. Although neither party has raised any concerns regarding the Speedy Trial Act, that statute provides pursuant to 18 U.S.C. § 3161(h)(1)(D), that 30 days are excludable for the Court's consideration of a motion after a hearing. After that, the Court finds that the ends of justice served by this delay outweigh Wright and the public's interest in a speedy trial due to the complexity of the legal and factual questions raised in the Defendant's motion to suppress. 18 U.S.C. § 3161(h)(7)(A). The necessity of spending sufficient time thoroughly evaluating these issues and reaching a correct legal conclusion clearly served the interests of justice. 18 U.S.C. § 3161(h)(7)(B)(i)-(iv).

BY THE COURT:


/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge